| | |
|---|---|
| NATALIA ARROYO,<br>     *Plaintiff*,<br>v.<br>HARTFORD BOARD OF EDUCATION,<br>     *Defendant*. | No. 3:17-cv-2067 (MPS) |

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Natalia Arroyo claims she was discriminated against on the basis of her ethnicity and her husband's race, in violation of Title VII of the Civil Rights Act of 1964. She further claims that she was retaliated against for filing a complaint with the CHRO. Because the evidence, viewed in the light most favorable to Ms. Arroyo, is such that no reasonable jury could decide in her favor, I find that there is no genuine issue for trial. Defendant Hartford Board of Education's motion for summary judgment is therefore GRANTED.

## I.     BACKGROUND

The following facts, which are taken from the parties' Rule 56 statements and the underlying record, are undisputed unless otherwise noted.

### A.     Arroyo's First Two Positions with the Hartford Board of Education

Arroyo began her employment with the Hartford Board of Education (the "Board") on February 1, 2012 as a temporary World Language Spanish Teacher at Burns Latino Studies Academy. (ECF No. 26-3 ("Defendant's 56a(1) Statement") at ¶ 1; ECF No. 27-1 ("Plaintiff's 56a(2) Statement") at ¶ 1.) She was hired as a permanent teacher and placed at Ramon E. Betances Early Reading Lab ("Betances") as the bilingual kindergarten teacher effective August 22, 2012. (Defendant's 56a(1) Statement at ¶ 2; Plaintiff's 56a(2) Statement at ¶ 2.) For the 2012-2013 school year, Arroyo was rated as "effective," but it was noted that "[s]he needs to

1

work on developing a cordial/collegial relationship with her peers in order to contribute to a positive school climate." (Defendant's 56a(1) Statement at ¶ 3; Plaintiff's 56a(2) Statement at ¶ 3.) Further comments noted that she should "[a]ccept criticisms with an open-mind considering you are a new teacher in a new building." (Defendant's 56a(1) Statement at ¶ 3; Plaintiff's 56a(2) Statement at ¶ 3.) For the 2013-2014 school year, Arroyo was also rated as "effective" but it was noted that "[w]hile Mrs. Arroyo gets along with her colleagues and other staff, she can often be aggressive in her communication [sic] examples of this are: bombarding administrators with text messages, and emails, in matters not often related to students. Acting unprofessional toward office staff – calling the office and making demands on staff." (Defendant's 56a(1) Statement at ¶ 4; Plaintiff's 56a(2) Statement at ¶ 4.) Her evaluation also stated that she needed to improve her attendance. (Defendant's 56a(1) Statement at ¶ 5; Plaintiff's 56a(2) Statement at ¶ 5.)

**B.     Arroyo's Transfer to Parkville**

At the end of the 2013-2014 school year, Arroyo was "aggressively" applying to transfer out of Betances. (Defendant's 56a(1) Statement at ¶ 6; Plaintiff's 56a(2) Statement at ¶ 6.) Principal Dirk Olmstead ("Principal Olmstead") of Parkville Community School ("Parkville")—another Hartford public school—personally interviewed Arroyo and recommended her for a bilingual position at Parkville, writing that "I think this would be a great fit for her and us." (Defendant's 56a(1) Statement at ¶ 7; Plaintiff's 56a(2) Statement at ¶ 7; ECF No. 26-2 at 162.) Principal Olmstead was aware that Arroyo was Hispanic when he recommended her for the position. (Defendant's 56a(1) Statement at ¶ 8; Plaintiff's 56a(2) Statement at ¶ 8.)

In November of 2014, Arroyo was reprimanded for sending emails during instructional time, which was against school policy. (Defendant's 56a(1) Statement at ¶ 9; Plaintiff's 56a(2) Statement at ¶ 9; ECF No. 26-2 at 164-67.) Principal Olmstead wrote:

> Please do not email during instruction time. The students should be your focus. [Assistant Principal] Marcie and I spoke with you about this last week. You need to follow all directions from administration. If this continues, there will be a consequence.

(ECF No. 26-2 at 167.) On another occasion, Principle Olmstead had to instruct Arroyo that she could not let her students sleep during instructional time after he walked by her classroom one day and saw the lights off and the students asleep with their heads on their desks. (Defendant's 56a(1) Statement at ¶ 10; Plaintiff's 56a(2) Statement at ¶ 10.)

## C.    Arroyo's 2014-15 Leave

Beginning November 17, 2014, Arroyo went on approved maternity and child rearing leave. (Defendant's 56a(1) Statement at ¶¶ 11, 13; Plaintiff's 56a(2) Statement at ¶¶ 11, 13.) On December 1, 2014, Arroyo informed the Board that she would not be returning to school for the rest of the 2014-15 school year. (Defendant's 56a(1) Statement at ¶ 12; Plaintiff's 56a(2) Statement at ¶ 12.) Once on December 1, 2014 and again on December 3, 2014, school officials emailed Arroyo to obtain her passwords so that her substitute could complete and print student report cards. (Defendant's 56a(1) Statement at ¶ 13; Plaintiff's 56a(2) Statement at ¶ 13; ECF No. 26-2 at 170-71.) The December 3 email indicates that school officials had also been trying to reach her by telephone at both her and her husband's phone numbers. (ECF No. 26-2 at 171.) Also on December 3, a school official sent Arroyo an email requesting the return of her key fob and door key, so that they could be given to the long-term substitute. (Defendant's 56a(1) Statement at ¶ 14; Plaintiff's 56a(2) Statement at ¶ 14; ECF No. 26-2 at 172.) On December 11, 2014, a school official again emailed Arroyo asking for the key fob and door key and requesting

that she complete and return a leave request form for her child rearing leave. (Defendant's 56a(1) Statement at ¶ 15; Plaintiff's 56a(2) Statement at ¶ 15; ECF No. 26-2 at 173.) Arroyo's only response was a letter sent to Principal Olmstead stating that, due to medical reasons, "I am unable to fulfill any of the requests that are continuously being made via email, U.S. mail, and phone to my work contacts, my personal phones [sic] numbers, and thru [sic] contacting my family members." (Defendant's 56a(1) Statement at ¶ 17; Plaintiff's 56a(2) Statement at ¶ 17; ECF No. 26-2 at 175.)

**D.     Arroyo's Attempts to Obtain a Different Position**

On April 24, 2015, the Board posted an English Language Learner (ELL) Coach – School-Based position. (Defendant's 56a(1) Statement at ¶ 18; Plaintiff's 56a(2) Statement at ¶ 18.) The duties included peer coaching, modeling instruction for teachers and paraprofessionals, monitoring student achievement, planning and implementing professional development for staff, conducting classroom visits, and offering parent workshops. (Defendant's 56a(1) Statement at ¶ 19; Plaintiff's 56a(2) Statement at ¶ 19.) The required skills included "[s]uccessful teaching experiences working with ELL students for a minimum of five years." (Defendant's 56a(1) Statement at ¶ 20; Plaintiff's 56a(2) Statement at ¶ 20.) Arroyo applied for the position and she and several other applicants were interviewed for the position in June 2015. (Defendant's 56a(1) Statement at ¶ 21; Plaintiff's 56a(2) Statement at ¶ 21.) The interview panel consisted of Principal Monica Brase (Asian), Assistant Principal Iris Ramos (Hispanic), Executive Director ELL Service Monica Quinones (Hispanic), Lead ELL Coach Mary Beth Russo (Caucasian), and Human Resources Specialist Janet Serrano (Hispanic). (Defendant's 56a(1) Statement at ¶ 22; Plaintiff's 56a(2) Statement at ¶ 22.) Arroyo received the lowest score of all of the applicants after her interview. (Defendant's 56a(1) Statement at ¶ 23; Plaintiff's 56a(2) Statement at ¶ 23.)

The top two scoring candidates, Maria Carrillo-Huerta (Hispanic) and Jessica Zanghi (Caucasian), were offered School-Based ELL Coach positions. (Defendant's 56a(1) Statement at ¶ 24; Plaintiff's 56a(2) Statement at ¶ 24.)

According to Arroyo, she applied for at least twelve different teaching and related positions for which she was qualified, but never received an interview and was rejected for each one. (Plaintiff's 56a(2) Statement at 6.) Arroyo notes that she has seven State of Connecticut teaching certifications relevant to the positions she sought. (*Id.*). Arroyo also claims that, on August 11, 2015, she was interviewed for the same ELL position she was interviewed for previously but with an emphasis on a particular district within the Board's system, and that she was rejected without an interview. (*Id.*) According to Arroyo, in July and August of 2015, she complained to the Board's Chief Officer of Human Resources about the discriminatory pattern of rejections to which she was being subjected, but nothing was done to resolve her complaints. (*Id.*)

E.     **The 2015-16 School Year**

On August 26, 2015, Principal Olmstead e-mailed a visitor policy to all of his staff. (Defendant's 56a(1) Statement at ¶ 25; Plaintiff's 56a(2) Statement at ¶ 25.) It stated in relevant part that:

> It is Parkville Policy that ALL visitors sign in at the Main Office. If visitors arrive after the office closes at 3:30 P.M., they are not to be allowed in the building. If you encounter any visitors as you are leaving after 3:30, please inform them that the office will reopen the next school day at 7:45 A.M.
>
> Family members and/or friends must sign in at the Main Office or be approved by administration PRIOR to their visit. Also, all visitors must enter and exit the building through the front doors by the Main Office. Under no circumstances should visitors leave through a classroom or side door, for security reasons.

(*Id.*) On August 31, 2015, Principal Olmstead added the following to the visitor policy via e-mail sent to all staff: "In addition to the policy mentioned below, all visitors should stay no

longer than 30 minutes. If a visitor needs to stay longer, they will require administrative approval." (Defendant's 56a(1) Statement at ¶ 26; Plaintiff's 56a(2) Statement at ¶ 26.) On December 2, 2015, Principal Olmstead sent Arroyo an e-mail stating:

> I observed you and your husband leaving Parkville through the main lobby yesterday at 5:00 P.M. However, when I looked at the visitor's pass book, he had signed in at 3:48 P.M.

> Please adhere to the school policy concerning visitors, especially the part about visitors being in the building for no longer than 30 minutes without prior approval by Parkville administration.

(Defendant's 56a(1) Statement at ¶ 27; Plaintiff's 56a(2) Statement at ¶ 27.)

According to Arroyo, on August 28, 2015, Arroyo's husband, who is a black African-American, came into the school building to help her set up her classroom. (Plaintiff's 56a(2) Statement at 6-7.) Arroyo claims that Principal Olmstead, who is Caucasian, noticed that her husband was in the classroom and asked him to leave immediately. (Plaintiff's 56a(2) Statement at 7.) Arroyo further claims that Principal Olmstead specifically stated to her that the reason he had asked her husband to leave was that her husband is black. (*Id.*) According to Arroyo, Caucasian employees were allowed to bring their family members into the building without prior approval, whereas Arroyo was not allowed to do so. (*Id.*) According to the Board, its visitor log shows that Arroyo's husband in fact visited Parkville in excess of 70 times during the 2015-2016 school year. (ECF No. 28 at 6; EF No. 28-2.)

On September 17, 2015, Arroyo was given a verbal warning confirmed in writing for entering the executive assistant's office and taking a photograph of her desk. (Defendant's 56a(1) Statement at ¶ 28; Plaintiff's 56a(2) Statement at ¶ 28.) The written warning, signed by Principal Olmstead, indicated that the desk contained confidential paperwork and that Arroyo had acted unprofessionally. (ECF No. 26-2 at 200.)

As of November 6, 2015, Arroyo had been absent on three Mondays and three Fridays. (Defendant's 56a(1) Statement at ¶ 31; Plaintiff's 56a(2) Statement at ¶ 31.)  Principal Olmstead instructed Arroyo that she needed to supply a doctor's note for any future absences on Mondays and Fridays.  (Defendant's 56a(1) Statement at ¶ 31; Plaintiff's 56a(2) Statement at ¶ 31.) Principal Olmstead indicated that, under Arroyo's contract, such conduct would be "considered a 'pattern of abuse' for extending a weekend."  (ECF No. 26-2 at 207.)

Arroyo was late turning in her report cards for December 2015.  (Defendant's 56a(1) Statement at ¶ 32; Plaintiff's 56a(2) Statement at ¶ 32.)

On January 12, 2016, Arroyo was given a verbal warning confirmed in writing for failing to enter an absence into SmartFind (the Board's automated system for teachers to request substitute teachers to cover their classes when they are going to be absent from school) and failing to inform the school that she would be absent on January 6, 2016.  (Defendant's 56a(1) Statement at ¶ 33; Plaintiff's 56a(2) Statement at ¶ 33.)  The administration learned of Arroyo's absence only when Principal Olmstead observed her class of kindergarten students still standing outside of the school without a teacher after all the other classes had entered the building. (Defendant's 56a(1) Statement at ¶ 34; Plaintiff's 56a(2) Statement at ¶ 34.)

On February 22, 2016, Arroyo was given a written warning for failing to enter a planned absence in the SmartFind system.  (Defendant's 56a(1) Statement at ¶ 35; Plaintiff's 56a(2) Statement at ¶ 35.)  The plaintiff grieved the written warning and an arbitrator found that the written warning was appropriate.  (Defendant's 56a(1) Statement at ¶ 36; Plaintiff's 56a(2) Statement at ¶ 36.)

Arroyo requested seven days of unpaid leave for March 8, 9, 15, 16, 22, 28 and April 25, 2016, stating the reason as "personal business that can't be conducted after school."

(Defendant's 56a(1) Statement at ¶ 37; Plaintiff's 56a(2) Statement at ¶ 37.)  The requests were denied.  (Defendant's 56a(1) Statement at ¶ 37; Plaintiff's 56a(2) Statement at ¶ 37.)  Arroyo then took unpaid unauthorized leave from March 7-10, and again from March 14-17.  (Defendant's 56a(1) Statement at ¶ 38; Plaintiff's 56a(2) Statement at ¶ 38.)  For the 2015-2016 school year, Arroyo had twenty-eight full day and three partial day absences.  (Defendant's 56a(1) Statement at ¶ 39; Plaintiff's 56a(2) Statement at ¶ 39.)

On March 17, 2016, during her second set of unauthorized absences, Principal Olmstead reached out to Arroyo to ask whether she was going to be back the next day for parent-teacher conferences.  (Defendant's 56a(1) Statement at ¶ 40; Plaintiff's 56a(2) Statement at ¶ 40.)  Despite opening the e-mail several minutes after it was sent, Arroyo failed to respond.  (Defendant's 56a(1) Statement at ¶ 40; Plaintiff's 56a(2) Statement at ¶ 40.)  Principal Olmstead therefore wrote a letter to parents of her students cancelling the parent-teacher conferences.  (Defendant's 56a(1) Statement at ¶ 41; Plaintiff's 56a(2) Statement at ¶ 41.)

Arroyo also failed to cancel her substitute requests for March 22 and March 28, 2016 after her requests for unpaid leave on these dates were denied.  (Defendant's 56a(1) Statement at ¶ 42; Plaintiff's 56a(2) Statement at ¶ 42.)  The District therefore incurred the cost of substitute teachers on those days.  (Defendant's 56a(1) Statement at ¶ 42; Plaintiff's 56a(2) Statement at ¶ 42.)

On March 28, 2016, Principal Olmstead wrote the plaintiff a detailed letter regarding his concerns with her performance, including eight (8) days of unauthorized leaves of absence, failure to respond to communications about parent-teacher conferences, and failing to submit report cards on time.  (Defendant's 56a(1) Statement at ¶ 43; Plaintiff's 56a(2) Statement at ¶ 43.)

Arroyo failed to teach and/or assess her students in the areas of science and social studies during the first two trimesters of the 2015-2016 school year. (Defendant's 56a(1) Statement at ¶ 44; Plaintiff's 56a(2) Statement at ¶ 44.) On the students' report cards, she simply wrote "NI" next to each of the skills. (Defendant's 56a(1) Statement at ¶ 44; Plaintiff's 56a(2) Statement at ¶ 44.) The other kindergarten teacher taught and assessed students in these areas during the same timeframe. (Defendant's 56a(1) Statement at ¶ 45; Plaintiff's 56a(2) Statement at ¶ 45.)

On April 7, 2016, Principal Olmstead issued the plaintiff a Review of Practice. (Defendant's 56a(1) Statement at ¶ 46; Plaintiff's 56a(2) Statement at ¶ 46.) According to Assistant Superintended Peter Dart, a "review of practice" is an optional, additional type of evaluation intended to supplement evaluations based on in-classroom observations. (ECF No. 26-2 at 57.) A Review of Practice "allows the evaluator to look at out-of-classroom artifacts and participation and behaviors that capture professionalism, attendance and professional learning, data team meetings, conferences, [and] report cards." (*Id.*) On her Review of Practice, Arroyo received a score of "1" or "ineffective" in numerous areas. (Defendant's 56a(1) Statement at ¶ 46; Plaintiff's 56a(2) Statement at ¶ 46.) Arroyo was given a "1" for "3d: Using Assessment in Instruction," because her report cards "did not have any Science and Social Studies grades" for December or March, and these subjects were "expected to be taught, practiced and assessed." (ECF No. 26-2 at 247.) Arroyo was given a "1" for "4b: Maintaining Accurate Records" for the same reason. (*Id.* at 248.) Arroyo was also given a "1" for "4a: Reflecting on Teaching," because her "report cards were submitted late," and, as a consequence, the "[a]dministration was not able to review and provide feedback prior to [parent-teacher] conferences." (*Id* at 248.) Arroyo was given a "1" for "4c: Communicating with Families" because Arroyo did not submit report cards until the first day of parent-teacher conferences, preventing the administration from

reviewing them and providing feedback prior to the conferences, and because at least one of Arroyo's unauthorized absences occurred on a day when parent-teacher conferences were scheduled. (*Id.*; Defendant's 56a(1) Statement at ¶ 47; Plaintiff's 56a(2) Statement at ¶ 47.) Arroyo also received a "1" for "4d: Participating in the Professional Community," because her "relationships with colleagues are characterized by negativity or combativeness." (ECF No. 26-2 at 249.) At the 2017 Committee Hearing,[1] Principal Olmstead gave several examples of Arroyo's interactions with staff members. For example, Principal Olmstead testified that at one staff meeting, Arroyo interrupted, talked over, and yelled at her colleagues. (ECF No. 26-2 at 105.) Principal Olmstead recounted another incident where, when a staff member pointed out that Arroyo was not following the proper procedure for early dismissals, Arroyo "began yelling at one of the staff members and saying I'm done, I'm done, you deal with it; and then she left." (ECF No. 26-2 at 106.) Ms. Arroyo also received a "1" for category "4f: Showing Professionalism" for submitting her report cards late, failing to communicate with the administration regarding her absences during parent-teacher conference week, and unauthorized absences. (*Id.*) Principal Olmstead also testified at the 2017 Committee Hearing that Arroyo also failed to follow other school policies and procedures, including failing to submit proper Confidential Leave forms, failing to call in for substitutes, submitting substitute plans that were incomplete, and failing to cancel substitutes when they were no longer needed. (ECF No. 26-2 at 106-07.)

---

[1] On January 9, 2017, the Board's Human Resources Committee conducted a hearing concerning Arroyo's non-renewal. Arroyo, Principal Olmstead, Assistant Principal Morrocco, and Assistant Superintendent Dart all testified under oath at the hearing, and both sides were represented by counsel. A full transcript of the hearing, with sparse redactions, has been submitted by the Board as part of the summary judgment record. (*See* Defendant's 56a(1) Statement at ¶¶ 51-53; Plaintiff's 56a(2) Statement at ¶¶ 51-53.)ECF No. 26-2 at 39-162.)

Principal Olmstead further testified at the 2017 Committee Hearing that he did not have any concerns about Arroyo's "actual instruction when she was in the classroom actually teaching kids." (ECF No. 26-2 at 108.)

According to Arroyo, the April 7 Review of Practice was the first time Principal Olmstead had evaluated Arroyo directly. (Plaintiff's 56a(2) Statement at 7.) Arroyo further notes that she had previously been graded as "highly effective," whereas Principal Olmstead rated her the lowest possible score in every category. (*Id.*) Arroyo also later testified at the 2017 Committee Hearing that she could not evaluate her students in the subjects of science and social studies because there was no kindergarten curriculum for these subjects. (ECF No. 26-2 at 133.)

## F. Arroyo's Non-Renewal

Under the Board's Policy No. 4116, only teachers who have "met the standard of excellence" are given tenure. (Defendant's 56a(1) Statement at ¶ 48; Plaintiff's 56a(2) Statement at ¶ 48.) Teachers whose performance has been "no more than adequate" during their period of probation are not eligible to be renewed or to receive tenure. (Defendant's 56a(1) Statement at ¶ 48; Plaintiff's 56a(2) Statement at ¶ 48.) On April 27, 2016, Arroyo was notified that her contract with the Board would not be renewed for the following school year. (Defendant's 56a(1) Statement at ¶ 49; Plaintiff's 56a(2) Statement at ¶ 49.) In a letter dated May 2, 2016, Assistant Superintendent Peter Dart provided the following reasons for Arroyo's non-renewal, which largely track Principal Olmstead's April 7 review of practice and his March 28 letter:

> [A]s measured by the Danielson Framework for Teaching in Professional Responsibilities Domain 4, is rated as Developing/Needs Improvement. Specifically [she was] "Unsatisfactory/Ineffective" in 4d Participating in the Professional Community, 4e Growing and Developing Professionally, and 4f Showing Professionalism. Work within 4b Maintaining Accurate Records and 4c Communicating with Families is rated as "Developing/Needs Improvement."
>
> Summative evaluations from 2012-2013 and 2013-2014 indicate concerns regarding [her] professional responsibilities. In addition, as indicated in a letter to

[her] dated 3/28/16, [she] failed to appear for work as required without authorization for eight days. Unauthorized leave is not only a disciplinary issue but also reflects a lack of professionalism (Domain 4f). Not being present impacts components within Domains 2 such as being able to establish a culture for learning (2b), minimizing a loss of instructional time (2c), and/or not being able to monitor student conduct during transitions (2d). Finally, [her] 2015-2016 summative rating for teacher related practices is a 2.88 which is minimally proficient and does not meet our standard of excellence or a potential of excellence.

(Defendant's 56a(1) Statement at ¶ 50; Plaintiff's 56a(2) Statement at ¶ 50; ECF No. 26-2 at 253.)

According to Arroyo, sometime shortly after she was notified that her contract would not be renewed, Assistant Superintendent Peter Dart informed her that the Board could reinstate her into her job if she dropped her CHRO complaint. (Plaintiff's 56a(2) Statement at 7.) Arroyo also testified at the January 2017 Committee Hearing that in late February of 2016, she had been told by Principal Olmstead, at an individual meeting, that she would have a position the following year as a kindergarten teacher. (ECF No. 26-2 at 134-35.)

A non-renewal hearing was held before a three-person committee of the Board on May 19, 2016 and January 9, 2017. (Defendant's 56a(1) Statement at ¶ 51; Plaintiff's 56a(2) Statement at ¶ 51.) At the non-renewal hearing, the plaintiff was represented by legal counsel and was given the opportunity to present evidence and testimony and cross examine witnesses. (Defendant's 56a(1) Statement at ¶ 53; Plaintiff's 56a(2) Statement at ¶ 53.) The Committee recommended upholding the non-renewal of the plaintiff's contract. (Defendant's 56a(1) Statement at ¶ 54; Plaintiff's 56a(2) Statement at ¶ 54.)

On February 21, 2017, the Board voted to uphold the Superintendent's recommendation to non-renew Arroyo's teaching contract. (Defendant's 56a(1) Statement at ¶ 55; Plaintiff's 56a(2) Statement at ¶ 55.)

Raquel Nunez (Hispanic) was placed in the bilingual kindergarten position that Arroyo previously held.  (Defendant's 56a(1) Statement at ¶ 57; Plaintiff's 56a(2) Statement at ¶ 57.)

## G.     Procedural History

On September 11, 2015, while she was still employed at Parkville, Arroyo filed a complaint affidavit with the Connecticut Commission on Human Rights and Opportunities ("CHRO") alleging that the Board discriminated against her on the basis of her race and ancestry when it denied her applications for various teaching and other related positions.  (Defendant's 56a(1) Statement at ¶ 29; Plaintiff's 56a(1) Statement at ¶ 29; ECF No. 27-2 ("Sept. 11, 2015 CHRO Aff.").)

On May 20, 2016, almost a month after Arroyo was notified that her contract would not be renewed and the day after the first non-renewal hearing, Arroyo filed a second complaint affidavit with the CHRO against the Board, alleging retaliation, discriminatory treatment on the basis of her husband's race, and that she was terminated in part due to her race and ethnicity.  (Defendant's 56a(1) Statement at ¶¶ 51-52; Plaintiff's 56a(2) Statement at ¶¶ 51-52; ECF No. 27-3 ("May 20, 2016 CHRO Aff.").)

A fact-finding hearing for the CHRO cases was scheduled for April 18, 2017 at 9:00 a.m.—approximately two months after the Board voted to uphold the Superintendent's recommendation to non-renew Arroyo's teaching contract.  (Defendant's 56a(1) Statement at ¶ 59; Plaintiff's 56a(2) Statement at ¶ 59.)  At 5:23 p.m. on April 17, 2017, Arroyo's attorney e-mailed a request for a postponement of the hearing, citing "unavailability due to a family illness."  (Defendant's 56a(1) Statement at ¶ 60; Plaintiff's 56a(2) Statement at ¶ 60; ECF No. 26-2 at 270.)  An attached letter explained that Arroyo "has accompanied her father to the hospital for a medical procedure and will not be able to make the fact-finding." (ECF No. 26-2 at

271.)  The CHRO denied the requested postponement, explaining that the request had been received after hours the day before the hearing, the case had already been postponed, the case was old, and there was no indication that "the circumstances rise to an emergency situation directly related to the Complainant."  (Defendant's 56a(1) Statement at ¶ 61; Plaintiff's 56a(2) Statement at ¶ 61; ECF No. 26-2 at 272.)

Arroyo failed to attend the fact-finding hearing.  (Defendant's 56a(1) Statement at ¶ 62; Plaintiff's 56a(2) Statement at ¶ 62.)  The Board appeared, and the fact finder interviewed the Board's witnesses.  (*Id.*)  After the hearing, the CHRO fact finder wrote to Arroyo's attorney requesting documentation justifying Arroyo's failure to appear by April 21, 2017.  (*Id.*)  On April 27, 2017, the Board provided the CHRO with documentation, obtained from Arroyo's new employer, Windsor Public Schools, through a Freedom of Information Act request, that showed that Arroyo was at work on the date of the scheduled fact-finding hearing.  (Defendant's 56a(1) Statement at ¶ 63; Plaintiff's 56a(2) Statement at ¶ 63.)  The Board also requested that the CHRO complaint be dismissed because of Arroyo's failure to cooperate.  (*Id.*)  Approximately two hours later, Arroyo requested a release of jurisdiction from the CHRO.  (Defendant's 56a(1) Statement at ¶ 64; Plaintiff's 56a(2) Statement at ¶ 64.)  A release of jurisdiction was subsequently issued on May 9, 2017.  (Defendant's 56a(1) Statement at ¶ 65; Plaintiff's 56a(2) Statement at ¶ 65.)  Several months later, on September 20, 2017, the EEOC also issued a release of jurisdiction, noting that the letter "should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious."  (ECF No. 27-4; ECF No. 27-5.)  Arroyo commenced the present suit by filing a complaint on December 11, 2017, alleging that the Board "discriminated against [her] because of her ethnicity and her husband's

race, and retaliated against her for complaining about it," in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* (ECF No. 1 at 1, 4.)

## II.     LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (internal quotation marks and citations omitted). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Phillip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

## III.     DISCUSSION

## A.     Arroyo's Title VII Discrimination Claim

Title VII discrimination claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). A plaintiff "first must establish a prima facie case of discrimination based on race. If he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employee's dismissal. If such a reason is proffered, the burden shifts back to the plaintiff to prove that discrimination was

the real reason for the employment action." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) (internal quotation marks and citations omitted). Arroyo alleges two distinct adverse employment actions: the rejection of her applications for other positions with the Board and the non-renewal of her position at Parkville. I address each in turn.

1.     **Arroyo's Unsuccessful Applications for Other Positions**

To establish a prima facie case of discriminatory treatment, a plaintiff must show (1) that she "belonged to a protected class"; (2) that she "was qualified for the position [she] held"; (3) that she "suffered an adverse employment action"; and (4) that "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (citation omitted).

The Board argues that Arroyo cannot meet the fourth prong of this standard, which requires her to show circumstances giving rise to an inference of discriminatory intent. (ECF No. 26-1 at 19.) I agree.

Inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios.'" *Howard v. MTA Metro–N. Commuter R.R.*, 866 F. Supp. 2d 196, 204 (S.D.N.Y.2011) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)). "No one particular type of proof is required to show that [an adverse employment action] occurred under circumstances giving rise to an inference of discrimination." *Moore v. Kingsbrook Jewish Med. Ctr.*, 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013) (citations omitted). An inference of discrimination can be drawn from circumstances such as "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of

employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]." *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001).

Arroyo has pointed to no evidence that supports the inference that discriminatory animus motivated the Board in declining to place her in any of the positions she applied for. Although she claims that she was rejected from 12 different positions, she only identifies two specific positions she applied for—an English Language Learner (ELL) position for which she interviewed on June 9, 2015 and a similar position at the district level for which she applied on or about August 3, 2015. (Sept. 11, 2015 CHRO Aff. at ¶ 8.) While she was not placed in either position, she supplies no evidence that discriminatory animus contributed to the rejection of her application. Rather, according to the undisputed facts, Arroyo received the lowest score of all of the applicants after her June 9 interview, and of the two top-scoring applicants who were offered positions, one was Hispanic. (Defendant's 56a(1) Statement at ¶¶ 23-24; Plaintiff's 56a(2) Statement at ¶¶ 23-24.) Because Arroyo's claims that she was turned down for these position on the basis of her race or ethnicity are wholly conclusory, I find that she has failed to establish a prima facie case with respect to this adverse employment action.

**2.      The Non-Renewal of Arroyo's Contract**

**a.      Prima Facie Case**

Arroyo argues that discriminatory animus on the basis of her ethnicity and her husband's race motivated the non-renewal of her position at Parkville. This argument includes two separate theories of race discrimination—discrimination on the basis of Arroyo's ethnicity and discrimination on the basis of Arroyo's husband's race—each of which I address in turn.

Arroyo claims that discriminatory animus on the basis of her Hispanic ethnicity motivated her non-renewal. (May 20, 2016 CHRO Aff. ("I was retaliated against and terminated

and believe that my race and ethnicity (Hispanic) was in part a factors [sic] in this action.").)

Discrimination based on Hispanic ethnicity qualifies as discrimination on the basis of race under Title VII. *Village of Freeport v. Barrella*, 814 F.3d 594, 607 (2d Cir. 2016) ("[F]or purposes of Title VII, 'race' encompasses ethnicity . . . .").[2] But Arroyo has produced virtually no evidence tending to show that her non-renewal occurred in circumstances giving rise to an inference of discrimination on the basis of her ethnicity—the fourth element of a prima facie case. The only arguable support for such an inference is a solitary statement in her March 2016 CHRO complaint that "Caucasian employees were allowed to bring their family members into the building without prior approval, whereas she couldn't." (May 20, 2016 CHRO Aff. at ¶ 12, ECF No. 27-3 at 3.) But while a plaintiff may satisfy the fourth element by "showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside [her] protected group,'" *Mandell v. County of* Suffolk, 316 F.3d 368, 379 (2d Cir. 2003), Arroyo has adduced no specific information to substantiate her allegation. She has not, for example, identified a single specific individual who was treated differently, let alone adduced evidence to show that the individual was similarly situated in all material respects. By itself, her vague and conclusory allegation of disparate treatment is insufficient to meet even the minimal burden of establishing a prima facie case. A title VII plaintiff "must . . . present at least some evidence by which a reasonable factfinder could determine that she was similarly situated to other employees outside of her protected class who were treated preferentially to her." *Goldman v. Administration for Children's Services*, 2007 WL 1552397, at *6 (S.D.N.Y. May 29, 2007); *see also Jones v. Western Suffolk Boces*, 2008 WL 495498, at *11 ("Although plaintiff asserts that

---

[2] Arroyo variously refers to her Hispanic identity as her "race" or her "ethnicity." In light of *Village of Freeport v. Barrella*, this distinction does not affect the Court's analysis.

white social workers with less seniority and experience were provided summer employment while he was not, plaintiff does not provide the names or any other identifying information of these purported white social workers, nor does he provide any evidence whatsoever to substantiate his conclusory allegation. As a result, plaintiff fails to satisfy the fourth factor of a failure to hire/promote claim and accordingly fails to establish a prima facie case of discrimination."); *Bickerstuff v. Vassar College*, 196 F.3d 435, 451-52 (2d Cir. 1999) (conclusory statements in affidavit insufficient to defeat summary judgment).[3]  I thus find that Arroyo has failed to satisfy the fourth element of her prima facie case with respect to her claim that her non-renewal was motivated by discriminatory animus on the basis of her Hispanic ethnicity.

Arroyo also argues that discriminatory animus on the basis of her husband's race motivated her non-renewal.  In support of this theory, she claims that Principal Olmstead singled out her husband, who is African American, for enforcement of the school's visitor policy.  (May 20, 2016 CHRO Aff. at ¶¶ 4-12.)  Arroyo describes one incident in particular, from August 28, 2015, where Principal Olmstead asked Arroyo's husband to leave the building, and when Arroyo asked him why, Principal Olmstead allegedly "responded that [sic] because he is black."  (*Id.* at ¶

---

[3] Arroyo's prima facie case is further weakened by the "same actor inference."  When "the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire."  *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997); *see also Saliga v. Chemtura Corporation*, 2015 WL 5822589, at *9 (D. Conn. Oct. 1, 2015) ("[W]hile the Second Circuit has not passed judgment on the extent to which [the same actor inference] is either required or appropriate outside the Age Discrimination in Employment Act (ADEA) context in which it is generally applied, district courts in this Circuit have applied it in both the Section 1981 and Title VII contexts." (citations and internal quotation marks omitted)).  Here, it is undisputed that Principal Olmstead was both the person who interviewed her and recommended that she be hired and the person who was most responsible for her non-renewal. (Defendant's 56a(1) Statement at ¶¶ 7-8, 43-47; Plaintiff's 56a(2) Statement at ¶¶ 7-8, 43-47.)

It is also undisputed that the individual placed in the position previously held by Plaintiff was also Hispanic, further weakening any potential inference of discriminatory intent.  (Defendant's 56a(1) Statement at ¶ 57; Plaintiff's 56a(2) Statement at ¶58.)

7.)  Arroyo argues that this evidence raises Arroyo's discrimination claim "above mere speculation" and creates a "genuine factual dispute."  (ECF No. 27 at 12.)

As an initial matter, discrimination on the basis of one's association with a member of a protected class, such as being married to a member of a protected class, is cognizable under Title VII.  *See Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008) ("[A]n employer may violate Title VII if it takes action against an employee because of the employee's association with a person of another race.").  Arroyo points to evidence—namely, her own sworn statement that Principal Olmstead said he asked her husband to leave because he was black (May 20, 2016 CHRO Aff. at ¶ 7)—that, if credited by the finder of fact, demonstrates discriminatory animus with respect to the enforcement of the visitor policy.[4]  It is a close question whether this evidence supports the inference that discriminatory animus on the basis of Arroyo's marriage to a black man motivated the non-renewal of Arroyo's contract, which happened eight months later and for which the Board cited reasons that were unrelated to any violation of the visitor policy.  But because "the burden of establishing a prima facie case of disparate treatment is not onerous," *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), I assume for the purposes of this analysis that Arroyo has met her prima facie burden of showing discriminatory animus.

**b.**      **Legitimate, Non-Discriminatory Reason**

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action (here, the non-renewal of Arroyo's contract).  The Board easily satisfies this burden.  The reasons the

---

[4] As discussed above, Arroyo's statement that "Caucasian employees were allowed to bring their family members into the building without prior approval, whereas she couldn't" (May 20, 2016 CHRO Aff. at ¶ 12, ECF No 27-3 at 3) appears to refer to disparate treatment on the basis of Arroyo's own race or ethnicity.  But even if read to refer to disparate treatment on the basis of her husband's race, this statement is too conclusory to provide any additional support for Arroyo's claim.

Board provided for Arroyo's non-renewal include her eight unauthorized absences, which Assistant Superintendent Dart explained "reflect[] a lack of professionalism" and impact several other performance criteria, including "being able to establish a culture for learning (2b), minimizing a loss of instructional time (2c), and/or not being able to monitor student conduct during transitions (2d)." (ECF No. 26-2 at 253.) The Board also pointed to Arroyo's poor ratings in the categories of "4d: Participating in the Professional Community," "4e: Growing and Developing Professionally," "4f : Showing Professionalism," "4b: Maintaining Accurate Records," and "4c Communicating with Families." (*Id*.) In his evaluation, Principal Olmstead justified these poor ratings on the basis of Arroyo's failure to evaluate her students in the subjects of social studies and science, her late submission of her report cards, her unauthorized absences during parent-teacher conference week, her failure to communicate with the administration regarding these absences, her poor and even combative relationship with her colleagues, and her failure to follow school policies and procedures. (ECF No. 26-2 at 105-07, 246-50.) These constitute legitimate, non-discriminatory reasons for declining to renew Arroyo's contract.

**c.     Pretext**

Because the Board has put forth legitimate, non-discriminatory reasons for declining to renew Arroyo's contract, the burden shifts back to Arroyo to "present evidence that would permit a rational factfinder to infer that the reasons for [her] [non-renewal] were pretextual." *Isaac v. City of N.Y.*, 271 Fed. Appx. 60, 63 (2d Cir. 2008). In evaluating whether Arroyo has met her burden, I must "examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer." *Byrnie v. Town of Cromwell Bd. Of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001). At the

third stage of the Title VII analysis, "the *McDonnell Douglas* presumptions disappear from the case, and the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000). "[T]o defeat summary judgment within the *McDonnell Douglas* framework . . . the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors. Regardless of whether the plaintiff can prove pretext, [she] bears the ultimate burden of persuasion, and must adduce enough evidence of discrimination so that a rational fact finder can conclude that the adverse job action was more probably than not caused by discrimination." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004) (internal quotation marks and citations omitted). "To meet [her] . . . ultimate burden, the plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more." *Id.* at 124 (internal quotation marks and citation omitted). "A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for racial discrimination." *Graham*, 230 F.3d at 43.

Arroyo admits much of the conduct the Board claims led to her non-renewal. For example, it is undisputed that Arroyo had multiple unauthorized absences during the 2015-2016 schoolyear. (Defendant's 56a(1) Statement at ¶ 38; Plaintiff's 56a(2) Statement at ¶ 38.) Arroyo also admits that, on one occasion in January, school officials did not become aware that Arroyo was absent until they observed her kindergarten class standing outside, without a teacher, after

all of the other classes had entered the building. (Defendant's 56a(1) Statement at ¶¶ 33-34; Plaintiff's 56a(2) Statement at ¶¶ 33-34.) It is also undisputed that Arroyo failed to evaluate her students in the areas of social studies and science in the first two trimesters of the 2015-2016 school year, contrary to the Board's expectations. (Defendant's 56a(1) Statement at ¶ 44; Plaintiff's 56a(2) Statement at ¶ 44.)

To the extent that Arroyo challenges the Board's reasons for her non-renewal, even resolving all factual disputes and drawing all reasonable inferences in her favor, she fails to produce evidence that can support a reasonable inference that the reasons were pretext for discrimination. Arroyo testified, for example, that her eight unauthorized absences were due to a medical condition. (ECF No. 26-2.) Elsewhere, Arroyo admits that she requested the leave "due to personal business that can't be conducted after school." (Defendant's 56a(1) Statement at ¶ 37; Plaintiff's 56a(2) Statement at ¶ 37.) But even if a finder of fact might reasonably credit her testimony that the absences were due to a medical condition, it would do nothing to establish that the absences were used as pretext for discrimination. Arroyo does not, for example, argue that the absences were not in fact unauthorized, or that similarly situated employees were treated differently from her in this respect.

Arroyo also testified that she made up any missed parent-teacher conferences, staying late on a Friday to do so. (ECF No. 26-2 at 136.) Even crediting Arroyo's testimony as true, as the Court must at this stage, making up missed work does not make unauthorized absences unproblematic for an employer, and it certainly does not tend to show that the citation of unauthorized absences by an employer was pretextual.

Arroyo also states that on April 7, 2016, Principal Olmstead "somehow became [her] evaluator even though he had never evaluated [her] performance before" and that he gave her

"the lowest possible score, meaning that she was ineffective," even though "prior to this evaluation, complainant had received ratings that graded her as highly effective." (*Id.*) But the mere fact that Principal Olmstead formally evaluated Arroyo on April 7, 2016, even though he had not done so previously, does not in itself support an inference of discrimination. There is substantial, undisputed evidence in the record that Arroyo's job performance had suffered in several respects. In the weeks before Principal Olmstead's evaluation, Arroyo had multiple unauthorized absences, had failed to submit her report cards on time, and the report cards she eventually submitted appear to have been incomplete. (Defendant's 56a(1) Statement at ¶¶ 37-44; Plaintiff's 56a(2) Statement at ¶¶ 37-44.) It is not surprising that a school principal might undertake to formally evaluate or otherwise document a teacher's performance in such circumstances, even if he had not done so previously.

Furthermore, Principal Olmstead testified at the committee hearing that he undertook to evaluate Arroyo himself because her usual evaluator, Assistant Principal Morrocco, was on maternity leave, and because he planned to recommend Arroyo for non-renewal and her recent performance issues needed to be documented for that purpose.[5] (ECF No. 26-2 at 103-04.) Although Arroyo testified at her non-renewal hearing that she was the only lower school teacher whose normal evaluator was Assistant Principal Morrocco and who Principal Olmstead evaluated himself while Assistant Principal Morrocco was on maternity leave (ECF No. 143 at 143), Arroyo does not point to any *similarly-situated* teachers—that is, teachers with similar job performance issues—who were treated differently from her. In short, Principal Olmstead's April

---

[5] Assistant Principal Morrocco testified at the January 2017 Committee Hearing that she also supported the recommendation not to renew Arroyo's contract. (ECF No. 26-2 at 125.)

evaluation of Arroyo does nothing to show that the reasons given by the Board were pretext for discrimination.

Arroyo also argues that she was justified in not evaluating her students in science or social studies because there was no curriculum for either subject. (ECF No. 26-2 at 133.) She also testified that "nobody at any point in time asked me to include Science and Social Studies" (ECF No. 26-2 at 134) and that she had also omitted science and social studies grades on previous occasions, including in November of 2015, but had not been reprimanded for doing so nor asked to correct the report cards. (ECF No. 26-2 at 136.) But elsewhere Arroyo admits that the administration expected kindergarten teachers to evaluate their students in these subjects and that the other kindergarten teacher was able to do so. (Defendant's 56a(1) Statement at ¶¶ 44-46; Plaintiff's 56a(2) Statement at ¶¶ 44-46.) And even if she had produced sufficient evidence from which a jury could reasonably conclude that the school's policy, and Principal Olmstead's enforcement of it, was unwise and even unreasonable, the relevant inquiry is "not whether the employer's stated reason for its decision is ill-advised, mistaken or unreasonable," but "whether the employer's stated reason is the actual reason for the challenged action." *Duckett v. Wal-Mart Stores, Inc.*, 2009 WL 995614, at *12 (W.D.N.Y. Apr. 14, 2009); *see also DeMarco v. Holy Cross High School*, 4 F.3d 166, 170-71 (2d Cir. 1993) ("[I]n applying the *McDonnell Douglas* test to determine whether an employer's putative purpose is a pretext, a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable."). There is no evidence that Principal Olmstead did not believe that the failure to include social studies and science grades was a violation of school policy and an indicator of poor performance, adding to the case for Arroyo's non-renewal, nor is there any evidence that the policy was not applied even-handedly or that Arroyo was singled out for the enforcement of this policy because

of her ethnicity or her husband's race. Thus, even crediting Arroyo's argument that it was unreasonable for Principal Olmstead to penalize her for not assessing her students in Social Studies or Science—just one of many reasons given by Board for not renewing her contract— this does little to show that the reasons provided by the Board were pretext for discrimination.

Although Arroyo fails to undermine the reasons cited by the Board for her non-renewal, this is not necessarily fatal to her claim, because a Title VII discrimination plaintiff may carry her burden at the pretext stage by showing that discriminatory animus *also* motivated the adverse employment action, in addition to the employer's non-discriminatory reasons. *Back*, 365 F.3d at 123. Arroyo points to two alleged incidents from August 25, 2015 and December 2, 2015, in which she argues that Principal Olmstead discriminated against her because of her husband's race.[6] (May 20, 2016 CHRO Aff. at ¶¶ 4-12, ECF No. 27-3 at 2-3.) While Arroyo does not allege that her husband was not permitted to visit the school otherwise, and the Board has produced records showing that, over the course of the 2015-16 school year, Arroyo's husband in fact visited the school in excess of 70 times (ECF No. 28 at 6; ECF No. 28-2), a reasonable jury could find that Principal Olmstead engaged in discriminatory enforcement of the visitor policy on at least these two occasions. But viewing the record as a whole, a jury could not reasonably conclude from this evidence alone that animus on the basis of Arroyo's marriage to a black man motivated the Board's decision not to renew her contract. Arroyo was notified that her contract

---

[6] As suggested above, Arroyo's allegations with respect to the second of the two incidents are ambiguous as to whether they allege discrimination on the basis of Arroyo's marriage to a black man or discrimination on the basis of Arroyo's own ethnicity. Arroyo concludes these allegations by stating that "Caucasian employees were allowed to bring their family members into the building without prior approval, whereas she couldn't." (May 20, 2016 CHRO Complaint at ¶ 12, ECF No. 27-3 at 3.) On its face, this statement appears to allege discrimination on the basis of Arroyo's *own* race or ethnicity, since she compares herself to her Caucasian colleagues. But in context, and particularly in light of Principal Olmstead's alleged August 28 remark (*id.* at ¶ 7), it could also be read to refer to discrimination on the basis of Arroyo's husband's race. Resolving all reasonable inferences and factual disputes in Arroyo's favor, I adopt the latter interpretation for present purposes, and thus construe the December 2 incident as also motivated by her husband's race.

would not be renewed almost six months after the later of the two incidents alleged by Arroyo, and the Board points to multiple instances of unprofessional conduct in the intervening months justifying its decision not to renew, including multiple unauthorized absences.

Further, Arroyo has pointed to no evidence that her alleged violations of the visitor policy, which Arroyo claims was enforced on a discriminatory basis, played any role in her non-renewal. Violations of the visitor policy were not cited by Principal Olmstead in his March letter to Arroyo about her performance, nor in his April Review of Practice, nor in the statement of reasons for her non-renewal provided by Assistant Superintendent Dart. Nor does Principal Olmstead, Assistant Principal Morrocco, Assistant Superintendent Dart, or even Arroyo herself so much as mention the visitor policy during the lengthy non-renewal hearing held in January 2017. (ECF No. 26-2 at 39-161.) There is simply no evidence tying any discriminatory enforcement of the visitor policy to Arroyo's non-renewal.

In addition, Principal Olmstead's criticism of Arroyo's professionalism and work performance began well before the alleged incidents involving Arroyo's husband. For example, during the previous school year, Principal Olmstead reprimanded Arroyo for sending emails and having her students sleep during instructional time. (Defendant's 56a(1) Statement at ¶¶ 9-10; Plaintiff's 56a(2) Statement at ¶¶ 9-10.) Arroyo was also criticized for lack of professionalism and poor attendance at her previous position with the Board at Bettances Elementary. (Defendant's 56a(1) Statement at ¶¶ 4-5; Plaintiff's 56a(2) Statement at ¶¶ 4-5.)

In short, Arroyo has pointed to no evidence establishing a nexus between her non-renewal and the alleged disparate treatment on account of her husband's race. *See Shah v. General Elec. Co.*, 816 F.2d 264, 271 (6th Cir. 1987) ("While [the evidence of disparate treatment Plaintiff points to] might raise an inference of discrimination regarding plaintiff's

treatment while employed, this is not the wrong for which plaintiff seeks recovery . . . . [This evidence] does not have a close enough nexus to the discriminatory acts alleged as a basis for recovery to *alone* establish an inference of disparate treatment."); *Wallen v. Teknavo Group*, 2019 WL 1435879, at *16 n.24 (E.D.N.Y. May 30, 2019) ("[A]lthough other allegations of discrimination, even if not independently adverse employment actions, may provide relevant background evidence by shedding light on the defendant's motivation, Plaintiff's proffered evidence is insufficient to support an inference of discrimination.") (internal citations, quotation marks, and modifications omitted). Nor has Arroyo pointed to any other evidence that might support a reasonable inference that her non-renewal was motivated by discriminatory animus on the basis of her husband's race.

In sum, viewing the evidence as a whole, and resolving all factual disputes and making all reasonable inferences in Arroyo's favor, I find that no reasonable jury could conclude that discriminatory animus on the basis of Arroyo's husband's race was a motivating factor in the Board's decision not to renew her contract. I thus conclude that Arroyo has failed to carry her burden at the pretext stage of the *McDonnell Douglas* framework.

**B.      Arroyo's Retaliation Claim**

Arroyo also claims that her non-renewal was retaliation for engaging in protected activity under Title VII. Retaliation claims under Title VII are also analyzed using the *McDonnell Douglas* burden-shifting framework. *Zann Kwan*, 737 F.3d at 843.

**1.      Prima Facie Case**

"In order to show a prima facie case of retaliation in response to a motion for summary judgment, a plaintiff must submit sufficient admissible evidence to allow a trier of fact to find: (i) conduct by the plaintiff that is protected activity under Title VII; (ii) of which the employer

was aware; (iii) followed by an adverse employment action of a nature that would deter a reasonable employee from making or supporting a discrimination claim; (iv) that was causally connected to the protected activity." *Cox v. Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014).

The Board does not contest the first three elements of Arroyo's prima facie case. With respect to causation, "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer . . . which is more demanding than the motivating-factor standard . . . ." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). A court may accept temporal proximity between an employer's knowledge of a protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case. *Summa v. Hofstra Univ.*, 708 F.3d 115, 127-28 (2d Cir. 2013) ("We have regularly held that the causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.") (internal quotation marks and alterations omitted).

Although Arroyo filed her first CHRO complaint on September 11, 2015, according to the Board, the complaint was not sent to it until October 7, 2015.[7] (Defendant's 56a(1) Statement at ¶ 30.) Drawing all reasonable inferences in Arroyo's favor, as the Court must at this stage, I assume for the purposes of this motion that the Board did not learn of the complaint until October—approximately six months before it notified Arroyo of her non-renewal. Six months is not "prohibitively remote" for purposes of establishing a prima facie case under Second Circuit caselaw. *Summa*, 708 F.3d at 128 (finding that seven months between the

---

[7] Because Arroyo filed her second CHRO complaint on May 20, 2016—after the Board decided not to renew her contract—I do not consider it here.

retaliatory action and the protected activity satisfied the fourth element of prima facie case); *see also Gorman-Bakos v. Cornell Co-op. Extension of Schenectedy Cty.*, 252 F.3d 545, 555 (2d Cir. 2001) (suggesting the lapse of five months between protected activity and retaliation may show a causal connection); *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (concluding that lapse of "only six months between dismissal of [plaintiff's] lawsuit" and retaliatory conduct was sufficient for causal connection). Moreover, here, the inference of causation from temporal proximity is strengthened by the fact that the particular adverse employment action at issue— non-renewal—can only be taken once a year; thus, the end of the 2015-2016 school year was the Board's first opportunity to decline to renew Arroyo's contract after it learned about her CHRO Complaint. I thus find that Arroyo has established a prima facie case of retaliation.[8]

## 2. Legitimate, Non-Retaliatory Reasons

"Once an employee establishes a prima facie case, the burden shifts to the employer to put forth evidence of a non-retaliatory rationale." *Cox*, 760 F.3d at 145. As discussed above, the Board has articulated multiple legitimate, non-retaliatory reasons for declining to renew Arroyo's contract, and thus has carried its burden.

## 3. Pretext

"Once the employer has [articulated legitimate, non-retaliatory reasons], the employee may prevail by demonstrating that the stated rationale is mere pretext." *Cox*, 760 F.3d at 145.

---

[8] Arroyo also claims that "[b]etween January 2015 and September 2015," she "experienced a series of harassing incidents with the Principal of [her] school, and other parties of Human Resources. The harassment occurred in part through e-mails and other actions, and [Arroyo] believes were [the] result of [her] notifying [the Board] of [her] intention to file a CHRO discrimination complaint." Arroyo adds that the incidents are "too numerous to list at this time." (Sept. 11, 2015 CHRO Aff. at ¶ 12.) Arroyo does not, however, point to any evidence substantiating these conclusory claims. She does not identify when she notified the Board of her intention to file a CHRO complaint, or whom she notified. Nor does she describe a single harassing incident. These assertions do not state an independent retaliation claim because, among other reasons, conclusory allegations of harassment do not satisfy the adverse employment action prong of the prima facie case. Nor, because they are conclusory and entirely unsubstantiated, do they add any support to the proposition that Arroyo's non-renewal was retaliation for filing the CHRO complaint.

"The employee at all times bears the burden of persuasion to show a retaliatory motive." *Id.* To establish pretext—that "the retaliation was a but-for cause of an adverse employment action"—a plaintiff can "demonstrate weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason . . . . Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage . . . . However, a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Zann Kwan*, 737 F.3d at 846-47; *see also El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext.").

As previously discussed, Arroyo has failed to produce evidence tending to show that the Board's reasons for declining to renew her contract were pretextual. Arroyo has also failed to point to any other admissible evidence, besides temporal proximity, that tends to show retaliatory intent or to establish a causal relationship between Arroyo's protected activity and her non-renewal, and the Court's own review of the record has revealed none.[9] Because no reasonable

---

[9] In her CHRO complaint affidavit, Arroyo alleges that Assistant Superintendent Dart offered to reinstate Arroyo to her position if she dropped her CHRO complaint. (May 20, 2016 CHRO Aff. at ¶ 17.) Arroyo does not appear to argue that this constitutes evidence of retaliation, but even if she did, this evidence is inadmissible under Rule 408 of the Federal Rules of Evidence, which bars the use of statements made during settlements negotiations for the purpose of proving or disproving the validity of a claim. *See, e.g.*, *Ortiz v. Town of Stratford*¸ 2008 WL 4630527, at *19 (D. Conn. Oct. 14, 2008) (finding an offer to reinstate plaintiffs in exchange for their agreement not to sue inadmissible as evidence of further retaliation under Rule 408).

jury could conclude that Arroyo's protected activity was the but-for cause of her non-renewal, I find that Arroyo has failed to carry her burden at the pretext stage.

## C.    Exhaustion of Administrative Remedies

Because I find that the Board is entitled to summary judgment on both Arroyo's discrimination claims and her retaliation claim, and exhaustion of administration remedies "is a precondition to bringing a Title VII claim in federal court, rather than a jurisdictional requirement," *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 385 (2d Cir. 2015) (citations and internal quotation marks omitted), I need not reach the Board's arguments that Arroyo failed to exhaust her administrative remedies.  Nor need I address the Board's argument that Arroyo's complaint was not timely, since "the 90-day filing period in 42 U.S.C. § 2000e-5(f)(1)" is likewise "not jurisdictional."  *McClendon v. Bronx County Dist. Attorneys Office*, 764 F. Supp. 2d 626, 628 (S.D.N.Y. 2011) (citing *Johnson v. AI Tech Specialties Steel Corp.*, 731 F.2d 143, 146 (2d Cir. 1984)).

## IV.    CONCLUSION

Because the evidence is such that no reasonable jury could decide in Arroyo's favor on any of her claims, I find that there is no genuine issue for trial.  The Board's motion for summary judgment (ECF No. 26) is therefore GRANTED.


IT IS SO ORDERED.


                                                        /s/
                                            Michael P. Shea, U.S.D.J.


Dated:          Hartford, Connecticut
                November 27, 2019